

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed September 22, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 13 |
| GORDON DANA KING & | § | |
| ANITA LAURIN KING, | § | CASE NO. 11-40617 (DML) |
| | § | |
| DEBTORS. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is *Debtors' Amended Chapter 13 Plan* (the "Plan"), at docket no. 22, filed by Gordon King and Anita King ("Debtors"), and the *Objection to Confirmation* (the "Objection"), at docket no. 25, filed by chapter 13 trustee Alice Whitten ("the Trustee"). The court held a hearing on confirmation of the Plan and the Objection on July 21, 2011, at which counsel for Debtors and counsel for the Trustee presented oral argument. The court has also considered, in addition to the Plan and the Objection, the *Trustee's Brief in Support of Objection to Confirmation of Debtors' Chapter 13 Plan* (the

1

"Trustee's Brief"), at docket no. 28, and the *Brief in Response to Objection to Confirmation of Plan* ("Debtors' Brief"), at docket no. 29.

Confirmation of the Plan and the Objection are subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(L). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 9014 and 7052.

## I. BACKGROUND

Debtors filed their voluntary petition for relief under chapter 13 on January 31, 2011. After confirmation of a first plan was denied,[1] Debtors filed the Plan on May 23, 2011. The Trustee filed the Objection on May 25, 2011, claiming that the Plan violates the unfair discrimination requirements of section 1322(b)(1) of the Bankruptcy Code,[2] discussed below.

Debtors owe $115,651.58 in non-priority, general unsecured claims. Of these claims, $65,439.00 are student loan claims and $50,212.58 are non-student loan claims.[3] Debtors and the Trustee have agreed that $12,449.40 is the appropriate amount for the unsecured creditors' pool ("UCP"),[4] calculated using Debtors' "projected disposable

---

[1] *See Order Denying Confirmation of Chapter 13 Plan and Denying Trustee's Motion to Dismiss for Failure to Confirm* at docket no. 20.

[2] 11 U.S.C. §§ 101 et seq. (the "Code")

[3] *See* Plan at 3.

[4] The UCP represents the amount to be shared by unsecured creditors based on the mandatory contributions a debtor is required to make under the Code. The UCP is calculated by multiplying a debtor's disposable income by the number of months in the applicable commitment period. Code § 1325(b)(1)(B). The Code defines "disposable income" as "current monthly income received by the debtor… less amounts reasonably necessary" for certain expenses. Code § 1325(b)(2). The figure for "amounts reasonably necessary" is calculated pursuant to Section 707(b)(2) for an above-median income debtor. Code § 1325(b)(3). Debtors are above-median.

2

income" determined under section 1325(b),[5] and Debtors' applicable commitment period under section 1325(b)(4)[6] of the Code.[7]

The Plan places student loan claims in a special class, separate from other general unsecured claims. The UCP is to be shared only among the non-student loan claimants. The class of student loan creditors receives no portion of the UCP, but the Plan provides for direct payments by Debtors to individual student loan creditors ranging from $5.00 per month to $128.00 per month.

## II. DISCUSSION

The Trustee claims that the Plan discriminates unfairly because the student loan creditors will receive direct payments totaling $32,400 over the term of the Plan, while the non-student loan creditors will each receive only a pro rata share of the UCP (total $12,449.40). Student loan creditors will receive returns of 27% - 92% of the face amount of their claims, while non-student loan creditors will only recover 25% of their claims.[8] The Trustee relies on section 1322(b)(1) as the basis for the Objection, which states that a plan may designate classes of unsecured claims, but "may not discriminate unfairly against any class so designated." Code § 1322(b)(1). For the reasons discussed below, the Trustee's objection must be overruled.

This court previously addressed the issue of unfair discrimination in *In re Simmons*, 288 B.R. 737 (Bankr. N.D. Tex. 2003). There were four plans before the court

---

[5] A plan may be confirmed over the objection of an unsecured creditor if the plan provides that all of the debtor's projected disposable income during the applicable commitment period will be applied to make payments to unsecured creditors.

[6] The applicable commitment period for an above-median income debtor is 60 months.

[7] *See* Debtors' Brief at 9 and Trustee's Brief at 6, 13.

[8] The Trustee points out that as of the claims bar date (8/1/11), the timely filed non-student loan claims total $38,368.06, leading to a recovery of 32% for non-student loan creditors.

3

in *Simmons*, each of which discriminated in favor of a separately designated class of claims consisting of student loan debt. As an initial matter, *Simmons* required that all of the claims in the specially designated class be substantially similar. *Id.* at 753. That requirement is clearly met by the Plan.

This court then applied a two-prong test to determine whether or not discrimination in a plan is unfair (the "Simmons Test"). *Id.* at 751. The first prong of the Simmons Test requires that the discrimination serve a rational purpose of the debtor. *Id.* This court held that separate classification of student loan debt serves a rational purpose. *Id.* at 752.

The second prong of the Simmons Test states that discrimination is not unfair if the class discriminated against receives no less than the amount it would have been entitled to receive if there were no discrimination, and 36 months[9] of the debtor's disposable income were applied to make payments under the plan. *Id*. at 755. In other words, a chapter 13 plan does not discriminate unfairly if a class of unsecured creditors receives its fair share of the UCP[10] based on the minimum amount the debtor was required to contribute under the Code. *Id*. at 752.

The application of the Simmons Test to the Shockey Plan (one of the plans at issue in *Simmons*) illustrates this court's understanding of unfair discrimination. The Shockey Plan included income in excess of the mandatory contributions to the UCP, and it proposed to pay student loan creditors in full. The UCP provided $8,440.12 for payment to unsecured creditors. The Shockey Plan devoted that entire amount pro rata to

---

[9] The "applicable commitment period" for all chapter 13 debtors was 36 months at the time *Simmons* was decided.

[10] The term "unsecured creditors' pool" (like "applicable commitment period") has been in use only since 2005. The court uses the term for earlier cases only for consistency and convenience.

4

only student loan creditors, leaving nothing for general unsecured creditors. This allocation resulted in a 100% return for student loan creditors, and a 0% return for non-student loan creditors. If there had been no discrimination, the Shockey Plan would have provided each of the unsecured creditors (both student loan and non-student loan) with a pro rata share of the UCP and a 36% return on their claims. The court determined that the Shockey Plan discriminated unfairly because it violated the second prong of the Simmons Test. However, the *Simmons* opinion went on to explain that payment in full of the student loan debt in the Shockey Plan was not necessarily improper, and that debtors "may, within reason, do anything they wish with disposable income *in excess of* [the UCP]." *Id*. at 755 n. 62 (emphasis added). The Shockey Plan failed to meet the requirements of section 1325(b) because it failed to allocate the available disposable income fairly, but *Simmons* made it clear that disposable income in excess of what was required could be applied discriminatorily.

After *Simmons* was decided the Code was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA" or the "2005 Amendments"). The changes to sections 1325(b) and 1322(d) under BAPCPA affect the Simmons Test, so the court must now examine these changes to determine if the Simmons Test is still applicable and if so, whether it must be modified.

BAPCPA changed the determination of projected disposable income for an above-median income debtor by substituting the "Means Test" of section 707(b)(2) for a calculation based on debtor's schedules I and J. Code § 1325(b)(3).[11] This calculation

---

[11] The term "projected disposable income" derives from the 2005 Amendments. Before then what was available under the plan was simply referred to as "disposable income". Hence, *Simmons* does not refer to projected disposable income, but rather to disposable income. Though the method of calculation changed, both terms refer to the amount the Code requires the debtor to pay out over the term of a plan.

5

now determines the amount a debtor must provide for unsecured creditors under a plan.[12] Section 707(b)(2) directs a debtor to use the amounts specified in the National Standards and Local Standards issued by the IRS, rather than his or her actual expenses, to calculate projected disposable income. This change allows for a potential discrepancy between a debtor's projected disposable income under the Code and his or her actual disposable income, meaning that a debtor could actually have more income than the Code requires him or her to contribute.[13]

The 2005 Amendments also changed the applicable commitment period for an above-median income debtor from three years to five years.[14] Code § 1322(d). The Trustee argues that *Simmons* is no longer applicable because this change eliminates the possibility that an above-median income debtor could contribute more than the Code requires under section 1325. *See* Trustee's Brief at 11; Code § 1325(b)(1)(B).[15] The Trustee correctly points out that a debtor can no longer automatically discriminate with contributions made after the third year of a plan, since contributions are now mandatory for a period of five years. The problem with the Trustee's argument is that an extended plan term was only one way for a debtor to contribute income in excess of the amount required by section 1325(b). A debtor can still contribute excess income by committing to pay an amount higher than his or her projected disposable income. In fact, as discussed

---

[12] Unsecured creditors alternatively would be entitled to the value of the debtor's equity in non-exempt property (if that provided a greater return). *See* Code § 1325(a)(4).

[13] Many courts refer to this excess income as "discretionary" income. *See In re Sharp*, 415 B.R. 803 (Bankr. D. Co. 2009). This "peculiar" effect – the difference between disposable income and the debtor's actual excess income – was also noted by Justice Kagan in the Supreme Court's recent decision in *Ransom v. FIA Card Servs., N.A.*, ___ U.S. ___, 131 S. Ct. 716, 729, 178 L.Ed.2d 602 (2011).

[14] The length of the plan need not be that long if the plan provides for payment in full of all unsecured claims over a shorter period of time. Code § 1325(b)(4)(B).

[15] This may be a valid objection. But in the case at bar the Trustee does not contest feasibility.

above, the determination of projected disposable income under the 2005 Amendments may make it more likely for a debtor to have truly disposable income in excess of the amount he or she is required to contribute to the plan.

The second prong of the Simmons Test need only be modified to mirror the 2005 Amendments. Thus, a plan does not discriminate unfairly if the class discriminated against receives no less than it would have received if there were no discrimination and 60 months (or 36 months for below-median income debtors) of the debtor's disposable income were applied to the plan. This modification does not change the principle of the Simmons Test – as long as the class discriminated against receives its fair share of the UCP, the discrimination is not unfair, and not in violation of section 1322(b)(1). After all, the Code requires only that a debtor pay the full amount of the UCP. Where, as here, the Plan so provides and otherwise meets the requirements of section 1325, the court is required to confirm the Plan ("the court *shall* confirm" – Code § 1325(a) (emphasis added.) If a debtor chooses to contribute income in addition to the mandatory contributions, then discrimination in the distribution of that amount does not diminish the return to other creditors and is not unfair.

The payments to student loan creditors proposed by Debtors in the Plan do not reduce the total amount of money in the UCP available to non-student loan creditors. The method of calculating projected disposable income under the current version of section 1325(b) leaves Debtors with income in excess of what they are required to contribute, allowing them to commit that amount to student loan creditors without diminishing the amount to which other unsecured creditors are entitled. When analyzing the Plan under the second prong of the Simmons Test, the result is that the class of non-

student loan creditors, (the class purportedly discriminated against,) actually receives a higher return under the Plan than it would if there were no discrimination. Under the Plan, the entire UCP is committed to non-student loan creditors. If Debtors chose not to contribute income in excess of their required contributions (meaning their plan would not discriminate in favor of any creditors), then each of the unsecured creditors (both student loan and non-student loan) would receive a pro rata portion of the UCP, diminishing the return to non-student loan creditors.

The Trustee urges the court to abandon *Simmons* and adopt the test set forth in *In re Bentley*, 266 B.R. 229 (B.A.P. 1st Cir. 2001). For the reasons discussed above, the court believes that the test set forth in *Simmons* is still appropriate, with the modifications required by the passage of BAPCPA in 2005. Furthermore, *Bentley* had already been decided when this court decided *Simmons*. If this court had wished to adopt the test in *Bentley*, it would have done so at that time.

The court is aware that another judge of this court reached a different conclusion with respect to the ability of an above-median income debtor to discriminate in his or her plan post-BAPCPA. *See In re Cooper*, 2009 WL 1110648 at *5 (Bankr. N.D. Tex. April 24, 2009). The court respectfully disagrees with *Cooper*, which does not appear to take account of the possibility of discretionary income. *Simmons* is still applicable with the modifications described in the present opinion to both above- and below-median income debtors.

Other courts have considered the issue of unfair discrimination since BAPCPA was enacted and have similarly concluded that discrimination is not unfair if it takes place as a result of a debtor's contribution of income in excess of the amount required

8

under section 1325(b). One illustrative decision is *In re Abaunza*, 452 B.R. 866, (Bankr. S.D. Fla. 2011).[16] In *Abaunza*, the debtors proposed to pay student loan debts outside of the plan using income in excess of the required contribution mandated by calculations of the debtors' projected disposable income. *Id.* at 868-69. The court noted that the mechanical test for calculating disposable income introduced by BAPCPA had made common the divergence between projected disposable income and a debtor's actual disposable income. *Id.* at 868-874. The court found it did not need to analyze whether the debtors' use of excess or "discretionary" income above projected disposable income discriminated unfairly because Congress had already defined that "fair" means contributing projected disposable income, no more and no less. *Id.* at 876. Since a debtor's projected disposable income defines "the pot" available for payments under a plan, there would be no unfair discrimination as long as all of the projected disposable income available to unsecured creditors was properly apportioned. *Id.* at 876.

While the court does not opine on the extent to which a debtor may use discretionary income outside of the plan, the overarching logic of *Simmons*, *Abaunza* and other decisions supports this court's finding that, post-BAPCPA, the unfair discrimination analysis allows a debtor to utilize funds in excess of projected disposable income to prefer certain creditors, as long as unsecured creditors receive at least their pro rata share of the UCP.

---

[16] *Abaunza* provides a thorough overview of the case law post-BAPCPA. *Id.* at 874. The *Abaunza* court noted that there are two lines of cases. The first line of cases finds that when all projected disposable income is paid to unsecured creditors, there is no unfair discrimination. *See, e.g., Sharp*, 415 B.R. at 812. The second line of cases addresses the situation in which a debtor uses projected disposable income to pay all creditors, including creditors separately classified and differently treated. In those cases, the courts use a fact-based analysis to decide whether a plan discriminates unfairly. *See, e.g., In re Kalfayan*, 415 B.R. 907 (Bankr. S.D. Fla. 2009).

Accordingly, the court holds that the Plan does not discriminate unfairly against the unsecured creditors because all of Debtors' projected disposable income is devoted to the UCP and each non-student loan creditor will receive a pro rata share equal to or greater than what it would receive were there no discrimination at all. Furthermore, as discussed above, the decision to separately classify the student loan claims serves a rational purpose of Debtors. Debtors have met the requirements of the Simmons Test, as modified above, and the Trustee's objection must be overruled. Therefore the Plan will be confirmed.

### III.    CONCLUSION

For the foregoing reasons, the Objection is **OVERRULED** and the Plan is **CONFIRMED**.

It is so **ORDERED**.

# # # END OF MEMORANDUM OPINION AND ORDER # # #